After this $108 billion merger, the nation's largest TV distributor and a TV programmer with critically important content will be able to extract hundreds of millions of dollars more for TV programming because they can threaten to poach the rival's customers if they don't pay up. The District Court's contrary conclusion suffers two pervasive logical inconsistencies that I'd like to focus on today. First, the District Court concluded that before the merger, bargaining leverage depends on the threat of blackouts, but that after the merger, bargaining leverage depends on whether blackouts will actually happen. Both of those can't be true. Second, the District Court also concluded that the new company will maximize its profits when that will help consumers, but won't do so when that will hurt consumers. Again, both can't be true. You're stating it in a way that creates the inconsistency. To recognize that the principle of maximization across corporate is an incentive is not to say that a particular actor would act in a particular fashion in order to achieve that goal, is it? I can recognize the principle without recognizing that it creates the particular incentive for the particular act, the jargon in this case. I think that's right, Your Honor. Your Honor, what we're saying here is that applying the logic of Copperwell, which holds that corporations will maximize their overall profits across divisions, means that Time Warner, after the merger, will operate to maximize its overall... It never means that a Time Warner actor will necessarily conclude that the corporate profits are enhanced more by blacking out and creating the possibility of a cancellation and transfer of customers than would be the case if they went ahead and didn't black out and got the normal advertising and rights profits. I think that's... It's two different things. I think that's right, Your Honor, but no one has... If that's right, then I don't see the inconsistency. Your Honor, I don't think anyone has argued here, unless I'm misunderstanding your question, that Time Warner will not act to maximize its profits. What we've put forward is that by threatening blackouts, knowing that blackouts are less costly because DirecTV is in the same company, it will obtain more money for the overall corporation. Didn't the district court acknowledge precisely what Judge Fentel's question states, that there is this principle? He acknowledged it. There wasn't any dispute about it in that sense, but given what had happened in the market and what was happening in the market, it didn't necessarily follow that the profit path was through blackouts as opposed to maximizing distribution, lower cost, et cetera. I think that's one way to read the court's opinion, Your Honor. If that's so, and our standard is clear error, where is the clear error? The clear error, Your Honor, if we take that interpretation of the opinion, I just want to be clear, that's not how the government's brief understands the opinion. If we take that interpretation, the only evidence that the court pointed to in the record for that particular proposition was a statement from an NBCU official, an NBCU executive, stating that in their particular company, they don't consider a particular identity. Of course, NBCU and Comcast are under a consent decree from the FCC and the Department of Commerce urges the very theory and prediction that is at issue in this case. Before the FCC, what the defendants told the FCC was that a standard economic model predicts that this proposed transaction would significantly increase the price that other MVTs pay for NBCU programming. What do you do with all the district court's findings about the nature and the change in the market and the evidence about this dramatic change in the last five years? Yes, Your Honor. The district court and certainly the government agrees that the industry is evolving, but I think the way to think about that point is that there was also testimony in the record and this is in the district court's opinion that the defendants consider DirecTV and their MVPD business, their golden goose or their cash cow that they're trying to preserve. Though the industry is certainly changing, the incentives are still the same to preserve just as they were in the Comcast-NBCU merger which was a few years ago. What I'm trying to explore with you is the incentive to maximize profit may be the same, but is it necessarily by the same path as existed in the previous market condition prior to this five-year period? Yes. I understand that, Your Honor. I don't think anyone at trial argued that or on appeal has argued that it would be less profitable for Time Warner to ignore DirecTV. What we're saying here and I think what the evidence showed was that in rejecting that analysis, Time Warner and the overall company would be leaving money on the table, so they would see hundreds of millions of dollars on the table. They would say, I don't want that and then turn away. There are hundreds of millions of dollars, whatever you're doing. If you're going on a blackout, you're losing all of the normal advertising, subscription profits that you would normally be getting. It's not that they're giving up all profit in order to get what you're saying they should get here with the blackout threat. It is that they could be making a calculus that would go either way. I think that's right, Your Honor. The principle of maximization just does not lead to either necessary result. It's a method of analysis. It's not a conclusion. Certainly, Your Honor. You have to put assumptions or evidence in in order to work an equation. The government, of course, agrees with I think most of what you said, but what we're saying here is not the new company will in fact blackout. That's what the district court was myopically focused on. But rather, if there's a threat of blackout, and that threat of blackouts will allow Time Warner to increase the prices for its rivals. Unless the threat is perceived as a possible prediction of reality, then the threat leads to nothing. As the judge could be construed to have said. If you have an empty threat of blackout, you're not going to get a heck of a lot of leverage out of that. Yes, Your Honor. Your Honor, I don't think that that's the proper way to understand the district court's opinion except for its focus, and that would be contrary to the wealth of evidence at trial regarding the threat of blackout. So I'll point, Your Honor, to JA 1713, which lists, and I'll be careful because it's a sealed document, but it lists the blackouts. Be careful about the sealed document. Yes, Your Honor. It lists the blackouts in this industry. And then I'll point, Your Honors, also to JA 506-07, which is not sealed. And this is testimony from the defendant's own executives stating that they almost went dark. They almost had a blackout with five major distributors in the preceding five or six years, with Time Warner Cable over a penny in 2012, with DirecTV, with DISH, with Altice, and with Charter. And so what this shows is that the threat of blackouts is real in this industry. The evidence, the wealth of evidence that the district court didn't focus on because he was focused on whether, incorrectly, blackouts will actually occur, the wealth of evidence showed that blackouts are routinely threatened. In fact, HBO's executive, which is part of Time Warner, threatened Charter with a blackout. The CEO of Turner said that blackouts are always a possibility. The chief negotiator, former chief negotiator, Breland, testified blackouts are always a possibility. In fact, we've prepared drop analyses to see what will happen when there's a blackout. And distributors testified to the same. So there's a wealth of evidence in this case indicating that the threat of blackouts is very real. And what the district court did instead was focus on whether blackouts will actually happen. And that's an inconsistency, an error, because it also concluded that before the merger, Time Warner has bargaining leverage because of the threat of blackouts. So it can't be the case, Your Honor, that before the merger, the leverage comes from the threat of blackouts, but that after the merger, the leverage comes from whether blackouts will actually happen. And that's inconsistent. It can't be the case that there's not enough change to create a substantial risk of unfair competition or whatever the language is in the statute there. It can be the case that you can have a threat before and a threat after, and the threat after is not sufficiently greater to make it a Wagner-Acker problem. So I don't think that's what the court was concluding. And I'll point, Your Honor, to JA-117 on that front, where the court said that I conclude that the government has failed to clear the first hurdle of showing that the proposed merger is likely to increase Turner's bargaining leverage. And there's some other citations in our brief about where the court concluded that there was no material increase of bargaining leverage. I think Your Honor used the term no significant increase in bargaining leverage. It would be better, certainly. However, if the judge did make a finding that there was no increase, that certainly would include the lesser finding that there's no material increase, would it not? Yes. If he said there's no increase, then no, I think, means no, Your Honor. Where is the plain error? The clear error, Your Honor, is that before the merger, he concluded that blackout, the leverage, was based on the threat of blackouts. After the merger, when he concluded there was no increased leverage, he solely focused on whether blackouts would actually happen. And that's just the same type of inconsistency we have in Hines. So in Hines, we have the same type of inconsistency where the court held in part of the opinion, the district court held in part of the opinion, that there was a single market for jarred baby food. And then in assessing the defendant's rebuttal case, it said, well, these two defendants don't compete against each other in this jarred baby food market. And this court said, we can't have that type of inconsistency. That sort of inconsistency can't stand. An opinion divided against itself shouldn't stand. And so it held that that was not proper. That's the same type of inconsistency that we have here. How are we supposed to assess the offer that AT&T Time Warner made with respect to the arbitration, the offer to arbitration and no blackouts? What are we supposed to do with that? What did the district court do with that? Did the district court rely upon that to say that there really wasn't a credible thread of blackouts and that blackouts were infeasible? I don't think that's what the district court did. So I'll point your honors to JA 196, where the court's discussion of the arbitration offer is primarily occurring. That's a footnote, a couple paragraphs in the opinion. And there he says that the arbitration offer makes him more skeptical or be more skeptical I think are the exact words of the government's case. So I don't think that there's a finding on the arbitration offer in that sense that AT&T would like there to be. And that makes sense because this arbitration offer is really too little too late. And let me spell that out. So the too little is that this arbitration offer is very different from what it was attempting to be modeled on, the arbitration offer for Comcast NBCU. Well, it's not just in the footnote. I guess that's footnote 51 is what you're talking about on page 149 of the opinion. There's another part of the opinion, which of course, because I'm looking for it, I can't find it. I think JA 152, your honor. But the, yeah, here it is. On page 105 of the opinion, I don't know the JA site because I have the opinion as a separate document that I've been working with. Where it's really pages, I guess, 104 and 105 where the district court says that the arbitration proceedings envisioned by Turner's offer are basically similar to what happened with Comcast NBCUniversal. And then it says on page 105 at the end of that first paragraph, given all these similarities, I conclude that Professor Carlton's econometric analysis of the pricing effects, et cetera, et cetera, can be afforded probative weight in predicting the potential pricing effects of the challenge merger. I mean, it seems that the district court relies on those arbitration offers to credit the other side's expert, and the other side's expert is what kills your case. And so isn't there essentially a finding with respect to those contracts that's key to this decision below? I think the only finding that is in these pages, your honor, is that the arbitration offer makes Professor Carlton's analysis of the Comcast NBC merger sufficiently comparable that it has some probative weight, which I believe is how the district court concluded, put it. But what it is not is a finding, what this is not is a finding that the arbitration offer somehow renders blackouts and feasible. It makes sense that there is no such finding because the only testimony in the record on the arbitration offer from industry witnesses comes from Charter, Cox, and Dish, all of whom testified that they thought that this was an unproven, risky arbitration offer that did not change the game for them. But the district court also said there in footnote 30 at the bottom of page 105 of its opinion that I have confidence that Turner's arbitration offer will have real world effect. I don't see how we're supposed to come away from all of this discussion without concluding that the district court essentially made a finding that this arbitration offer was real, tangible, enforceable would affect the marketplace and the bargaining position of the parties, etc., etc. But yet, your brief doesn't make an argument that any such finding was clear error. Your Honor, I don't think we can read from this one line in a footnote about an unspecified real world effect that there is some sort of alternative holding of the district court that can be deferred to. This is a pretty slender read to say... I mean, it's not just there. I've just pointed to other language in the text, not the footnote, and then there's subsequent language along the same lines. I guess I'm just trying to understand. On the one hand, you're saying that the district court clearly erred because in a post-merger world, the threat of blackouts wouldn't change. The efficacy of that threat wouldn't change. But yet, in a post-merger world, there are these contracts that have been offered for arbitration that weren't there before, and the district court seemed to rely on those contracts. So how can we just ignore that and say the district court has irrationally switched positions? Your Honor, I want to make sure I'm understanding your question. I don't think that the district court said anywhere in the opinion, except perhaps from intuiting from a couple of lines and footnotes, that the arbitration offer somehow changed the game. That's what AT&T wants the opinion to look like on appeal, but that's not what it actually looks like. There's some line in the text, a paragraph or so, that, as Your Honor pointed out, there's two footnotes on the issue. And there's good reason for that in light of both the testimony that I mentioned that was unrebutted from those distributors, but also in light of the Supreme Court's view on what we should make of these post-acquisition type of maneuvers. As we've discussed in our brief, the courts have looked sort of skeptically on these. And the key case there, I'll point you to, is General Dynamics, which explained that this type of post-acquisition evidence courts should treat skeptically. And, in fact, the Supreme Court had twice rejected that type of evidence. And the reason that it rejects that type of evidence, the Supreme Court did, is because it's unproven and it's risky, just like it is in this case. So, unlike the Comcast-NBCU merger, where the arbitration offer was based on fair market value and there was a way to assess that because Comcast was a regional distributor, here DirecTV is a national distributor, so there is no competitive benchmark. Also in Comcast-NBCU, the arbitration offer was backed by the de novo review of the FCC. We don't have that here, we have a private offer among parties. And so that's the reason that the Supreme Court has looked skeptically on this type of evidence, is that it's unproven and risky. And that's exactly what I think the district court's mentions of this mean. To elevate these footnotes and the paragraph Your Honor pointed out into a whole new opinion, seems to be exactly the type of concern that the Supreme Court was raising, namely that we're putting too much weight on something that played a big part in the district court's opinion. I see that my opening time is about to expire. We're not very good at obeying the clock, especially with Robertson City's control of the bar, but only God can control the bank. We have a couple of questions that may not be of critical importance, but the language in your brief, you assert that the district judge obviously did not understand economic principles. His ruling was consistent with the testimony of the witness, Professor Carlton, was it not? Some parts were and some parts were not, Your Honor. Professor Carlton testified that corporations maximize their profits overall, so in that sense it was inconsistent. No, we're not. We've already been over that. We won't go back to that. We may just disagree, Your Honor. Corporations don't maximize their profits. He simply said that that would not work in the way of an incentive that the other expert had prosecuted. He didn't say that principle, no. I think that's one reading of the district court's opinion, Your Honor, and we've been over this, so I don't want to continue to disagree just for the sake of it. But I think you may have another question that you were getting to. Is it related? Did you note the amicus brief of the 37th scholar? Yes, Your Honor. And that's people like Richard Epstein, Henry Butler, Christopher Egan, who were all saying that this judge didn't reflect a deep understanding of economics. Do you still propose, as you say in your brief, that he just didn't understand economic principles? Your Honor, we stand by what's in our brief, and of course there are the leading antitrust treatise writer is an amici for our side, saying the district court failed to properly apply principles of economics, and I think he... There are different things in failing to understand principles. The application of it may get down to a difference in Chicago or London, but it isn't the same thing as not understanding to apply it differently than your expert wants him to, or your amicus wants him to. Your Honor, I think in our brief we use the words misapply and misunderstand almost interchangeably, so I'm not sure that we're actually disagreeing about what we're talking about. All right. Help me understand this $352 million in savings to customers. Sure, Your Honor. The first time the district court refers to that, I think, as savings to direct TV, and later on he refers to it more generally as savings to customers, and the argument in part is that just reflects a complete misunderstanding by the district court of what was happening in this area and what Professor Shapiro was trying to point out. Yes, you're exactly right, Your Honor. No, I know, but what's the response? Sure. So the way that the district court used the $350 million was not the type of concession that they talk about, and it couldn't be under this court's decision in Anthem and under the way that Professor Shapiro's model worked. So what Anthem states with respect to efficiency defenses is that the key is the amount of inefficiency that is passed through to consumers. What the $350 million is, though, is the amount that will possibly be realized to the new company, not the pass-through. The pass-through amount, Your Honor, is $78 million, but that number cannot be derived independently of the amount of raised prices to rivals and the amount of that that is passed on to consumers, because in the simulation both are figured out at the same time, both are derived at the same time. One can't say Professor Shapiro's wrong about everything except $78 million. The model doesn't work that way. That's not how the math comes out. It can't be derived. All right. So then AT&T says, well, even if your bargaining model is accepted on its own terms and the arbitration no blackout mechanism is ignored, the government still fails to satisfy its additional burden of showing that the net retail prices will likely be higher. And then it goes through these three points and you dispute them in your brief, but in terms of a clear error standard of review, how do you prevail in terms of the inflated subscriber loss rate finding, the diversion rates and margins, and then that the district court had improperly relied, ignored the preexisting contracts? Your Honor, I don't think we have to prevail on that in the way that Your Honor is outlining, because the government was not under an obligation to quantify the harm in the way that AT&T believes. That's what Brown Shoe... No, I understand that, but well, I understand your argument, but what I'm trying to understand is they're saying this part of the argument is assume you're right on your economic theory and how it works. The problem is where was the evidence to show that the district court clearly erred in finding that what you did need to show to support the application of the model in this case wasn't there? Yes, Your Honor, and I think the way to think about that is the way the district court thought about that on page 156, and then again on 16 of the JA, not the district court opinion. What the court says is that it's rejection... is that Professor Shapiro's model is also insufficient to rule for the government. So it's not correct to think of Professor Shapiro's model here on appeal as an alternative ground for affirmance when what it was in the district court was another reason to rule for the government, and then he rejected that other reason to rule for the government. All that is to say is that the government didn't have to put on the quantification in Professor Shapiro's model. So if we just take the quantification out, the government can still prevail. That's what Brown Shoe stands for when it says that Section 7 is not about exclusively mathematical tests, and that's what Anthem stands for when it says that the loss of... And counsel, I'll concede that you're more familiar with this than I am, but my understanding of the issue here was that these are valid economic principles, but it's not enough to just cite the principle. You have to show it fits within the particular context you're dealing with, and that's what, as I understand, this argument is all about. That's before us. Yes, Your Honor, but Professor Shapiro's quantification had very little to do with the actual fit. So what the fit that they're talking about was established by was the numerous defendant executives who testified, the industry witnesses who testified, and then another part of Professor Shapiro's testimony, not the quantification, but the first half where he talked about in sort of a summary fashion what all this meant, how Nash bargaining worked, and how the incentives would play out. That's separate from his quantification, and so in that part of his testimony, what he explained was that in a situation like this, the incentives change, and DirecTV has a different incentive. All that, just that part, putting aside the quantification, was enough for the government to prevail. So even if all the government had was that after the merger, the incentives change, that was enough for the government to meet its burden without putting any numbers in? No, no. Yes and no. And let me explain because that was a double answer there. What the government had to show was that the three key inputs, so to speak, were all not zero. As long as they were all not zero, that subscriber loss, diversion rate, as long as all of them were not zero, then there's an increase in cost to the rivals. No one at trial testified that any of them were zero. And so even putting aside Professor Shapiro's quantification of exactly how much each number is, the government was able to make its case out because none of the numbers were zero. And so that means that there was a raised price for rivals, which means... I don't understand that. I thought that the briefing said that if you change the number from 9% to 5% in Shapiro's model with respect to, I guess, the number of customers who would leave if there was a blackout, that that completely changed the outcome of the modeling such that there was no longer a price increase. Am I correct about that? Yeah, I think that's right, Your Honor. It's true that the model was sensitive, which is, of course, a virtue of the model, not a bug, as some would have us believe. It's good that the model changes when the numbers change. But I think what that goes to show, I don't think that establishes, what I think is the implicit premise of your question, that that somehow dooms the government's case because we didn't have to do any of the quantification to get any numbers out of it. So once we established the testimony from the witnesses about how the incentives would change and there was no testimony that any of the numbers were zero, there's an increased harm. Then the burden of production goes over to the other side in the Baker-Hughes framework to put forward some sort of efficiency defense or some sort of other explanation. Efficiency. I mean, the saving by however many million it was, the two different burdens of it, I guess, that evidence is in there. Your own expert put that in. Yes, Your Honor, but that's only true if you also... If you use the zero numbers and have a smaller result than that saving, then haven't you lost your carrying of the burden? You have to show that there is... You have to show that there's going to be a harm to competition. I'm sorry? You have to show that there's going to be a harm to competition substantially. Certainly, Your Honor. And if you have a saving that more than counterbalances the increase in cost or the increase in the model that you're talking about, then you haven't carried your burden, have you? Yes, that's also generally true, Your Honor, but you can't just take the 78 million and throw away everything else because it's all intermingled. It's interdependent in the merger simulation model. You can't derive the 78 million without also crediting Professor Shapiro's testimony on the other point. We're past that. We're talking about your statement that if the number is anything greater than zero, then you've carried your burden. That doesn't follow. If there is the showing of the 78 million or 300-some million, whichever it is, if there is a showing of that, don't you have to show that there is an increase using the Shapiro, the NASH model that Shapiro is using? Don't you have to show that that number will wind up with a product that is greater than what the saving that's been shown by the other parts of the evidence? I think that's right, Your Honor, but let me try this a different way so that we're not misunderstanding each other. The district court stated on JA-101 that it was not doing balancing, that what it concluded was that there was no increased costs, full stop, no increased costs at all for rival distributors. That does not make sense if all the numbers are not zero. It's just flatly inconsistent. That can't be the case. Where the burdens are. I'm sorry, Your Honor? Remember where the burdens are.   the burden there in court, in the district court, and then here again, you have to show that there's plain error in the district court. You have to show that there's plain error in the district court. And if the savings number is greater than what results from the NASH analysis conducted by Shapiro, then you haven't carried that burden, have you? Well, Your Honor, Your Honor, the $78 million is inseparable from the rest of Shapiro. So we can't just say that that's just freestanding on the ledger and that's not what the district court in fact did. He said on JA-101 that he was not doing balancing, that he said that there was no increase. And another way to think about that is that the government didn't make out its prima facie case in this case. And even though, as I pointed out, if those numbers are not zero, all three of those numbers are not zero and there's no testimony in the record that there was, there is an increased cost to rivals. So under the government's first theory, though, which is what we've been discussing, the government had to show that the proposed merger is likely to support substantially lessened competition by increasing Turner's bargaining leverage in affiliate negotiations. So some of those adverbs, it seems to me, just fly in the face of your statement about if all the numbers are zero, you win. At least his first theory. Under the prima facie case,     with Brown-Schuh. So in Brown-Schuh, there was no quantification. So in Brown-Schuh, there was no quantification. So in Brown-Schuh, there was no quantification. But what I read was simply your first theory. Yes, Your Honor. All right. So you had to put in some evidence somehow beyond just the economic theory that the merger would substantially lessen competition. And your first theory was it would increase Turner's bargaining leverage in affiliate negotiations. And the district court heard testimony and made some credibility findings and explained why he rejected some of the testimony on which you were heavily relying. Yes, Your Honor. Although I don't think he made any adverse credibility findings with respect to the distributor witnesses who testified, and this is Cox, Charter, and Dish, that they were concerned about excessive pricing increases. That's a direct quote from the Charter witness. There's no adverse credibility finding about that issue. There's certainly a lot of findings in the district court opinion on other witnesses. But I don't think there's anything about that. And that's exactly the same type of evidence that the government puts on in prima facie cases all the time. And it's exactly the same type of evidence that entirely carried the day in cases like Brown Shoe where there was no quantification, there was none of this regression simulation modeling that the government put on. It would be sort of perverse to say that the government is worse off for putting on a quantification and attempting to provide a readout. I don't know if you're saying you're worse off for putting on a quantification. I think we are saying that if you're going to rely on an economic model, you have to rely on it with quantification. The bare theorem of John Nash's theorem doesn't prove anything in a particular case. You have to have numbers to make a model work. That's what a model is. Your Honor, I don't think that's consistent with antitrust precedent like Brown Shoe or Anthem. There was no quantification in Brown Shoe. They put on testimony explaining the harms from the vertical merger. They didn't attempt to quantify those in any respect. None of that involved a quantification. I think your Honor is drawing a distinction that the government respectfully disagrees with. Is Brown Shoe using modeling? No, your Honor. Whatever Brown Shoe said, it has nothing to do with whether you have to use numbers to make modeling relevant into a real world case. Your Honor, I disagree with the premise of that question. The testimony about how Nash bargaining works is not modeling in the same sense that you're using. If you're going to get the findings you want in the end, you have to have  numbers. It's not enough to say this is a valid theory that has been used in other antitrust cases. You have to have numbers to show that you have the effect on competition that you have to prove to carry your case. You can credibly argue that you can simply present an economic principle whether we're talking about modeling or some other way of presenting it. That's the principle. Therefore we win. But that's not what I'm arguing. What we're saying here is that the government can put on evidence from industry witnesses to show what will happen after the merger. So Professor Shapiro's model according to his testimony was designed to identify the incentive that would exist after the merger. So that's not putting a precise number but your position is that is sufficient for the government to meet its initial burden of proof? Yes. I think that's exactly right, Your Honor. One way to think about it is Professor Shapiro has two separate lines of testimony. The first half of his testimony is about what he thinks there's a reasonable probability of happening after the merger. He looks at the defendant's testimony, the defendant's filings, and he says here's how I would analyze this as an expert witness. And there's another part of Professor Shapiro's testimony that has to do with quantification. And what we're saying is we don't need that quantification part. We may or may not need the bargaining theory. It depends how the witnesses came in, whether they were understandable, et cetera. But it certainly helps to have that type of expert testimony to help the judge make sense of it. So then to the extent that Professor Shapiro's  was clear, what's your response? I'm not in the quantification part. I'm in the bargaining theory part. I'm not sure what exact defects you're referring to, Your Honor. I think Professor Shapiro thought that his explanation of Taking into account the long-term contracts, for example. He said he hadn't examined some of the underlying data. That type of thing. Right. So, for example, the long-term contracts, I think it's clear from antitrust principles and the Supreme Court's case law in Cargill and El Paso that that's not the type of reason to put aside particular testimony because what we're concerned about is the arresting anti-competitive tendencies in there. I know, but just help me out here. If they're long-term contracts, doesn't that affect the incentives? In other words, my incentives may be different if I'm not faced with obligations under long-term contracts. That's what I'm trying to focus on. That type of defect could affect the incentives after merger. That's all I'm trying to say. I think that's right in response to Your Honor's question. But I think what Professor Shapiro's ultimate analysis in the long-term contracts was exactly spot-on in light of the Court's decisions in El Paso natural gas where there was a long-term contract and the Supreme Court wasn't concerned and Cargill where there was a potential long-term  in prices and the Supreme Court was not concerned about that discrepancy. I think that's both appropriate and accurate for Professor Shapiro's question. So I'm not sure that I understand what your position is with respect to the $350 million savings efficiency number. So it appears that whatever that number is, it seems somewhat troubling and I'll have questions for the other side about that. But the amicus brief of the open markets institute I think it is says that once the plaintiffs establish there's a reasonable probability of a substantial reduction in competition from the merger, that's it. That there is no efficiency defense, so to speak. And so all of this discussion about efficiencies, they don't lay all of this out, but I think that's really beside the point. That doesn't seem to be the way that you're arguing this or that you argued this in your brief. Am I wrong about that or help me understand what your position is? I think you're right about that. We've taken the position following the Anthem decision that if there is an efficiency defense, then it has to be focused on the pass-through number. And so here, in some sense, the court doesn't have to focus on how to resolve the question that was raised. That is the way that we've addressed it. Whatever the efficiency defense is, however that works, and we realize there's dispute among circuits, perhaps within the circuits, on that point, it can't be what AT&T has suggested, which is that we just say $350 million, which is not the pass-through number, and then we call it quits. That can't be the case. If we agree with you on that, is that sufficient to remand? Even if we disagree with you about everything else? I don't know if that is, Your Honor, to be honest. Obviously I'd like to answer that question, yes, but I think the best way to understand the District Court's opinion is to conclude that it didn't actually do balancing, that it just said there was no price increase to the rival distributors, and so it didn't even really do the type of balancing that I think my colleagues on the other side would have you believe, such that there's a balance in the ledger of $350 or $78 million. I don't think that's what the Court did, and I think that answers your Honor's question. All right, thank you. I reserve the rest of my time for rebuttal. Thank you. All right, counsel, let me give for the 27 antitrust scholars. As opposed to the 37 scholars. Yes, correct. Good morning, Your Honors. My name is Eric Citron. I'm a member of the district court. I just wanted to thank the court for giving us some time to share a perspective, maybe say a word about what we're doing here. The reason that my clients wanted to participate in this case is that there are two points that are made in a really complicated  One of them presents some pretty serious confusion about important points. One of the points is essentially legal. The other point is essentially economic. I'm going to start with the second one because I think that's where the greatest opportunity for confusion is. If you look at the district court's opinion, it's clear he thinks he has a special case on his hands. Even after the merger, Time Warner will have an incentive to make a deal. It's going to be more profitable if it does deal instead of going into a long term blackout. That's not a special case. That's the ordinary case. The whole problem John Nash is trying to solve is what happens when both sides are better off from making a deal, how do they divide up the spoils, the surplus that making a deal creates. Let me ask you on JA131 where the district court says that the use of the Nash bargaining model counts as a mark against defendants attempts to disavow the applicability of the theory in this case. Rather my conclusion in this case doesn't turn on the defendants protestations that the theory is preposterous. It says it's on my evaluation of the shortcomings in the third party competitor testimony about the complexity of these negotiations and the low likelihood of long term blackout and the real world pricing data and experiences. Are you saying one or more of those points is wrong as a matter of what economic principle? Thank you for drawing my attention because I wasn't going to mention it in this passage but it's an important one. The testimony about the complexity of the negotiations and the low likelihood of a long term blackout. The Nash bargaining model predicts that blackouts would be infrequent and probably never occur because both sides are better off making a deal. What about the language cited in the 37 scholars from 1953 article where Nash seems to endorse or suggest that the threat has to be realistic. The threat has to be credible. I'm happy to point out that the likelihood that the parties will actually go to war or go into a labor strike or have a catastrophic outcome isn't an input into the model. It's just an output. We're trying to figure out what's going to happen. We expect them to make a deal. Low probability of having a blackout is the expected outcome. The reason I think you have to understand the threat is we know before the merger that Turner was not giving away its content for free. There was a price at which it was willing to walk away. This is a misunderstanding the district court has. It's not like an on-off switch. It's credible at a particular price. If you said you pay me to display your content so you'll get advertising dollars, Turner would say no, I'm not going to do that. At some price point, it's credible. The intuition there is they're both fatal. We know the first one is not fatal. There's some price at which Turner will walk away. That price is demonstrably changing. That's what happens. That's what professor Shapiro's testimony is. If Turner doesn't make a deal, that outcome is better for Turner. It's not better than making a deal. The downside risk goes down a little bit. The price at which they're willing to make a deal goes up. This thing that blackouts are unlikely, that Turner is still going to be interested in making a deal. The hard problem is when both sides do have an    We're trying to figure out how to divide it up. The other problem is when both sides do have an interest in making a deal.       do   in making a deal. The other problem is when both sides do not have an interest in      sides  not have an interest deal. The other problem  both is when both sides  not have an interest in            interest in making a deal. The other problem is when both sides do not have an interest in making a deal. The  problem is when both   not  interest in making a both sides do not  interest in making not have an interest  making do not have an  in making a deal. problem is when both  do     making a deal. The other  is when both sides       is when both  do not have an interest in making a deal. The other problem is when both sides do not have an interest in making           interest in making a other problem is when            problem is when both sides do not have an interest in making a deal. The other problem is when both sides do            do not have an when both sides do            sides do not have an interest in making a deal. The other problem is when both sides do not have an interest  making a deal. The in making a deal.  other problem is when have an interest in  a deal. The other problem  both sides do not other problem is when  sides do not have do not have an            not have an interest
judges: Rogers, Wilkins, Sentelle